**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| **BRIAN COADY**<br>**1454 Monroe Street, NW**<br>**Washington, DC  20010**<br><br>    **Plaintiff,**<br><br> **v.**<br><br>**THE HONORABLE ANTHONY R. FOXX**<br>**SECRETARY OF TRANSPORTATION**<br>**1200 New Jersey Avenue, N.W.**<br>**Washington, D.C.  20590**<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **Case No.:  1:16-cv-2010**<br>)<br>)<br>)  **JURY TRIAL DEMAND**<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiff Brian Coady, by and through counsel, hereby files this Complaint for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and the Rehabilitation Act, 29 U.S.C. § 791, et seq. against Defendant Anthony R. Foxx, Secretary, U.S. Department of Transportation.

**JURISDICTION AND VENUE**

1.     This court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e *et seq*., and 29 U.S.C. § 791 et seq.

2.     Plaintiff has exhausted all administrative remedies prior to filing suit.

3.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4.      Plaintiff Brian Coady, (hereinafter "Plaintiff" or "Mr. Coady") is a male and a resident of Washington, DC.

5.      Defendant Anthony R. Foxx (hereinafter "Defendant" or the "Agency") is the Secretary of the U.S. Department of Transportation ("DOT"), an administrative agency of the United States government and an "employer" within the meaning of the statutes under which Plaintiff brings his claims.

## FACTUAL ALLEGATIONS

6.   Plaintiff  Coady was employed by the Department of Transportation ("DOT"), Federal Motor Carrier Safety Administration ("FMCSA" or "Agency") from January 18, 2009 through 2016.  Mr. Coady is currently employed as a GS-15 2210 IT Specialist.  During times relevant to this action, Mr. Coady also served as Executive Program Manager and was the contracting officer's representative for the largest contract for FMCSA.

7.   Mr. Coady has over thirty years of service with the federal government and worked as an IT Executive Project Manager for the Department of Justice prior to his tenure at FMCSA.   For most of his tenure at the DOT, Mr. Coady received performance ratings of acceptable or higher.

8.   Kelly Leone (Regal) was Mr. Coady's immediate supervisor until September 2011, when she was promoted and became his second level supervisor.  Elizabeth ("Libby") Mary Clapp was Mr. Coady's immediate supervisor from September 2011 to August 2012, and Steven Smith, Office Director and MC-R, was his immediate supervisor from August 2012 through 2014.

Disability, Leave Requests, and Requests for Accommodation

9.   In June 2010, Mr. Coady began to experience severe pain in his lower back and legs

and was diagnosed with spondyloisthesis, segmental instability, spinal stenosis, radiculopathy, sacrolititis, and lumbar disc herniation related to his back.  His physician warned Mr. Coady that he faced certain disability if he did not receive a "fusion" surgery for his condition and informed Mr. Coady that he had to have three physical therapy appointments per week for a six-week uninterrupted period to prepare his body for surgery and to receive authorization for surgery. During a follow up appointment with his physician, Mr. Coady scheduled surgery for September 2010, contingent on his completion of the required number of physical therapy sessions.

10. Shortly after receiving the diagnosis, Mr. Coady informed Ms. Leone, Ms. Shelton, and other Agency employees about his condition and limitations and stated that surgery was necessary for his condition and to be approved for surgery, Mr. Coady was required to attend physical therapy appointments three times per week for a six-week period.

11. Mr. Coady immediately began physical therapy and attempted to schedule appointments three times per week.  However, Mr. Coady was unable to complete the required physical therapy appointments because Ms. Leone continually harassed him about taking leave for physical therapy.   Ms. Leone would frequently tell Mr. Coady to schedule his leave around important meetings.   Mr. Coady used his best efforts to schedule his leave around important meetings, but it was impossible because Mr. Coady had important meetings every day throughout the day, many of which were difficult, if not impossible, to predict.  On some days, Mr. Coady was in important meetings all day.  If Mr. Coady missed any meeting for a physical therapy appointment, even if Mr. Coady had been unable to predict the time of the meeting, Ms. Leone reprimanded Mr. Coady and told him he was required to attend each meeting.  Mr. Coady had to cancel numerous physical therapy appointments so as to not miss a meeting, and Mr. Coady was unable to attend the required three physical therapy appointments per week.  Despite making

3

numerous efforts to balance his work with his physical therapy, including by moving to a physical therapy provider closer to work, Mr. Coady was unable to complete the required physical therapy sessions and had to cancel his surgery scheduled for September 2010.

12. In August 2010, Ms. Leone appointed Mr. Coady as acting IT Development Chief, in addition to Executive Program Manager and the contracting officer's representative for the largest contract for FMCSA.  Due to the increase in Mr. Coady work responsibilities and because Ms. Leone reprimanded him each time he had to take time off from work for his health, Mr. Coady was unable to restart the six weeks of physical therapy.

13. On July 19, 2011, Mr. Coady attended a meeting with Ms. Leone and others and informed Ms. Leone that he was having chest pains and felt dizzy and had to leave the meeting to go to the emergency room, particularly in light of the fact that his mother had suffered a heart attack.  When Mr. Coady returned to work, Ms. Leone told him that he had let everyone down by leaving the meeting, referred to his visit to the hospital as a "stunt," and asked Mr. Coady what he had to say for himself.

14. On August 6, 2011, Ms. Leone called Mr. Coady on the phone during a work-related trip to Orlando, Florida, which she had previously approved.  She complained in an agitated manner that Mr. Coady was not at his office when there was so much work that needed to be done at FMCSA.  Mr. Coady reminded her that he would soon need to take time off to address his back injury and said that he was unwilling to become disabled by failing to undergo the treatment necessary for his condition.  Ms. Leone aggressively asserted, "I have an office to run, here, Brian." On another occasion, Mr. Coady described the necessity of obtaining treatment for his condition and informed Ms. Leone that he was unable to walk more than one block without excruciating pain.  She replied in an annoyed and dismissive manner, "We're all getting old."

15. In October 2011, shortly after Ms. Clapp became Mr. Coady's supervisor, his symptoms worsened, and Mr. Coady scheduled a doctor's appointment and submitted the proper medical leave request through the Agency's Castle system.  During Mr. Coady appointment with his doctor, he informed his doctor that he did not think the Agency would allow him to take the leave necessary to undergo physical therapy and pleaded for his doctor to consider scheduling the surgery without the required physical therapy treatment.  Mr. Coady's doctor agreed to make an exception and approve him for the surgery without the required physical therapy sessions, if his primary care physician and the VA Medical Center cleared Mr. Coady for the surgery.  At this time, Mr. Coady's doctor also told him that he was at risk for a fracture in his spine, if he continued to exert himself, including commuting to work.  The next day, Ms. Clapp demanded Mr. Coady provide medical documentation of every medical appointment, even though Mr. Coady had followed FMCSA procedures regarding medical leave requests.

16. In response to Ms. Clapp's demand, Mr. Coady requested a doctor's note and was given an unsigned note because the doctor was out of town attending a funeral.  Mr. Coady gave the note to Ms. Clapp, and she objected to the documentation because it was not signed.  When Mr. Coady explained that the doctor was out of town attending a funeral, Ms. Clapp responded by directing Mr. Coady to predict these types of events.

17. Mr. Coady had several follow up medical appointments starting in November 2011 and submitted a doctor's note immediately after each appointment.  In late November 2011, Mr. Coady met with Ms. Clapp and Warren Pegram, and Ms. Clapp told Mr. Coady that the doctor's notes were not sufficient medical documentation.   She demanded Mr. Coady provide two sets of documentation for each medical appointment: a pre-appointment letter signed by his doctor indicating the time and date of the appointment and a post-appointment letter signed by his doctor,

which stated his diagnosis and treatment plan.  Mr. Coady consistently provided documentation in support of sick leave requests and continuously attempted to comply with Ms. Clapp's specific demands regarding documentation of his leave requests, but nothing he provided Ms. Clapp was considered sufficient.  Moreover, Mr. Coady's doctors would not sign letters prior to his medical appointments.  In addition, during the November 2011 meeting with Ms. Clapp and Mr. Pegram, Mr. Pegram told Mr. Coady that he had to submit an FMLA request because if he does not process an FMLA request, his supervisor could terminate him at any time.  Mr. Coady stated that he did not want to request FMLA leave because he did not wish the Agency to has access to all his medical records.  Mr. Pegram replied that they could just subpoena his medical records.

18. No other FMCSA employees were required to submit documentation in support of medical leave requests, much less required to provide a signed doctor's note in advance of any doctor's appointment or confidential information concerning diagnoses and treatment.  In addition, none of Mr. Coady's leave requests relating to his back injury were made under Executive Order 5396.

19. Carolyn Butler was the Agency's reasonable accommodations officer and was responsible for assisting in reasonable accommodation requests and coordinating between Agency employees and their supervisors concerning such requests. Mr. Pratt and Mr. Pegram are not responsible for assisting Agency RMOs with matters concerning reasonable accommodation.

20. In November 2011, Mr. Coady submitted a request for reasonable accommodation, asking to telework until his surgery.  In support of Mr. Coady's request, he provided a note from the Virginia Spine Institute, dated November 22, 2011.  During a meeting with Ms. Clapp and Mr. Pegram, Ms. Clapp objected to the doctor's request because it specified that Mr. Coady should be allowed to telework, and she stated that his physician did not have the authority to determine the

manner in which the Agency should accommodate his physical limitations. She demanded Mr. Coady provide another letter stating his diagnosis and limitations, so she could determine whether and how Mr. Coady would be accommodated. Mr. Coady filed an EEO complaint with the Agency on November 28, 2011.

21. Mr. Coady immediately complied with Ms. Clapp's demand and gave her a letter from his general practitioner at the Department of Veterans Affairs dated December 2, 2011, identifying his physical limitations. Mr. Coady also gave Ms. Clapp a second letter from the Virginia Spine Institute, which identified his diagnosis and described his physical limitations in detail. The letter from the Virginia Spine Institute Mr. Coady gave to Ms. Clapp was two pages long and was signed by his physician. Although Mr. Coady's December 2, 2011 doctor's note from the Virginia Spine Institute identified his diagnoses and limitations, including his inability to sit for more than an hour and his need to lay down during the day, Ms. Clapp objected to both letters and stated that the medical documentation needed to state his physical restrictions in greater detail, including by indicating the exact amount of time he was able to sit or stand.

22. Mr. Coady contacted the Virginia Spine Institute and conveyed Ms. Clapp's request. She was informed that this request was very unusual and the Virginia Spine Institute would not provide more information than the diagnoses, treatment, and limitations described in the December 2, 2011 letter. Mr. Coady was directed to convey requests for further documentation to the Institute's attorney. Counsel for the Virginia Spine Institute did not provide the requested information.

23. In another attempt to satisfy Ms. Clapp's requirements, Mr. Coady sought a second opinion from George Washington University ("GWU") on January 3, 2012 and promptly provided her with a note from GWU Medical Faculty Associates indicating that he could not lift or carry

more than ten pounds and could not perform "work requiring walking, standing or sitting without a break every 60 minutes."

24. Ms. Clapp once again objected to this statement purportedly because it did not specify the accommodation requested and denied Mr. Coady request for accommodation. However, Mr. Coady did not know what other information he could give Ms. Clapp, since he had already provided doctor's notes that indicated he was requesting to telework, described his diagnoses in detail, and explained his limitations, including the specific length of time he could sit and stand. Mr. Coady reasonably believed that nothing he gave Ms. Clapp would be considered sufficient and that she would find a reason to deny his request regardless of what medical documentation he provided.

25. Mr. Coady continued to attempt to get additional documentation in support of his reasonable accommodation request. Mr. Coady requested the VA Medical Center provide the requested medical documentation, but learned that he had to submit an authorization for medical release form prepared by the VA Medical Center. Mr. Coady submitted this form and received a copy of all his medical records, but none of these records contained commentary on the restrictions and constraints of his condition. Mr. Coady visited the VA Medical Center to discuss Ms. Clapp's requests and learned that it would be incredibly challenging, if not impossible, to obtain medical documentation of his condition in sufficient detail to comply with Ms. Clapp's requests.

26. Mr. Coady scheduled surgery with Virginia Spine Institute was canceled on January 7, 2012 because Washington VA Medical Center had not cleared him for the surgery since he had not completed enough physical therapy sessions. Mr. Coady tried to reschedule his surgery on a near-weekly basis, but was unable to reschedule it, in large part, due to insufficient physical

therapy treatment.  Mr. Coady had to restart the process of receiving approval for surgery and preparing for surgery through the VA Medical Center.

27. Mr. Coady finally received the necessary operation at the Baltimore VA Medical Center on January 29, 2013.  At the time of Mr. Coady surgery, he had a pars fracture in his back, which he had been warned he was at risk for if he exerted himself, including commuting to work.

28. Mr. Coady symptoms has improved since his surgery, and he is able to walk short distances.  However, due to the delay in his treatment, the Agency's failure to provide Mr. Coady with reasonable accommodation, and the fracture in his spine, likely from commuting, Mr. Coady has permanent limitations.  Mr. Coady will likely be unable to run or dance and will have to live with constant back pain for the rest of his life.

Charge of AWOL

29. When Mr. Coady woke up on February 27, 2012, his back was exceedingly stiff and painful.  Mr. Coady immediately notified Ms. Clapp that his back was very painful and went back to sleep.  A short while later, Mr. Coady developed a high fever and realized that he had caught the flu.  Mr. Coady illness was so severe that he could not go to the doctor, but he called his doctor and requested a prescription.  On February 28, 2012, Mr. Coady notified Ms. Clapp that he had caught the stomach flu or had food poisoning and had received a prescription from his doctor.

30. Mr. Coady was pre-approved for annual leave on February 29, 2012 for personal reasons.  Mr. Coady had to miss his personal obligations because he was severely ill, and during the night of February 29, 2012, his fever increased to 103 degrees Fahrenheit.  Mr. Coady went to the emergency room because he feared he might had pneumonia and went to sleep as soon as he was released.  When Mr. Coady woke up the next morning, he realized he still had an IV in his arm.

31. On March 1, 2012, Mr. Coady was scheduled to telework, and his illness had improved enough that he was able to telework, even though he was still severely ill.  Mr. Coady could not go to the hospital to have his IV taken out because Mr. Coady had to telework, and thus, decided to return to the hospital that evening.

32. Mr. Coady was not aware of Ms. Clapp's requests that he complete sick leave requests in the Castle system until March 1, 2012 because he was very sick and groggy, was in extreme pain and discomfort, and slept nearly the entire days of February 27, 28, and 29, 2012.  Mr. Coady immediately entered Castle requests for February 27 and 28, 2012, as requested, and notified Ms. Clapp of his status and treatment.  After teleworking, Mr. Coady fell asleep and did not wake up until the next morning, so he was unable to get the IV taken out.

33. On March 2, 2012, Mr. Coady went to work with the IV still in his arm because he was afraid that Ms. Clapp would take action against him for taking sick leave.  Mr. Coady gave Emeric Pratt his emergency room discharge papers dated March 1, 2012 and explained that he could not provide medical documentation for his absences on February 27 and 28, 2012 because he had been too sick to go to the doctor.  Mr. Coady went back to work and was working when the IV came out of his arm.  Mr. Coady notified Mr. Secrist, who was his acting supervisor that day, and went to the hospital.  Immediately after Mr. Coady returned to work, he gave Mr. Pratt his hospital discharge papers for March 2, 2014.

34. On March 5, 2012, Mr. Coady once again notified Ms. Clapp that he did not have a doctor's note for February 27 and 28, 2012 because he had been too sick to go to the doctor on these dates.  Although Mr. Coady had previously provided his emergency room discharge papers for the night of February 29 (dated March 1, 2012) and March 2, 2012, he also gave Ms. Clapp a copy of his doctor's prescription, dated February 28, 2012, and a signed letter from his housemate

stating that he had been in his room sleeping on February 27 and 28, 2014.  Mr. Coady also reported Ms. Clapp's unreasonable demands to his union representative on March 5, 2012.  In a final attempt to provide additional documentation of his illness, Mr. Coady also requested a letter from his physician, stating that he had contacted his physician on February 27, 2012 due to illness.

35. None of Mr. Coady colleagues were required to provide documentation in support of leave requests.  Mr. Coady colleague, Henry Bailey, caught the flu around the same time as him and missed three days of work.  On the first day Mr. Bailey was sick, he called Ms. Clapp and told her that he was sick, but did not submit any leave request on Castle until he returned to work, three days later.  Ms. Clapp did not reprimand Mr. Bailey for failing to submit a Castle leave request in advance or demand any medical documentation of his illness.

36. In late March 2012, Mr. Coady union representative, Eugene Johnson, met with Ms. Clapp and Mr. Pratt concerning Ms. Clapp's charge of AWOL.  Ms. Clapp misrepresented that Mr. Coady had provided only a get well card in support of his sick leave request.  When Ms. Johnson expressed disbelief of Ms. Clapp's statement, Mr. Pratt finally admitted that Mr. Coady had also given him emergency room discharge papers.  Due to pressure from the union, Warren Pegram suggested that Ms. Leone convert the AWOL to sick leave on April 24, 2012.

Travel Vouchers

37. In August and September 2011, Mr. Coady attended three work-related trips in Florida and Texas.  Shortly after returning from his trip to Austin, Texas in September 2011, Mr. Coady approached Ms. Clapp and asked her if he could submit his travel vouchers for reimbursement in the next fiscal year because he had a great deal of work to do.  Ms. Clapp responded affirmatively and suggested Mr. Coady contact John McGuiggin and Wendy Noble-Burns to confirm that he would be able to receive reimbursement, even if he submitted his vouchers late.  Both Mr.

McGuiggin and Ms. Noble-Burns indicated that it was acceptable for Mr. Coady to submit his vouchers in the following fiscal year.

38. Managers generally submit their travel vouchers to their assistants for processing.  Mr. Coady submitted his travel vouchers to his executive assistant for processing in September 2011, but his assistant never processed his vouchers because she left employment with the FMCSA.

39. In approximately January 2012, Mr. Coady asked Joyce Perkins (female, no disability, no prior EEO activity) to process his travel vouchers, but she indicated that she was having difficulties processing them.  Mr. Coady repeatedly contacted Ms. Perkins, Mr. McGuiggin, and Ms. Noble-Burns, and each of them gave Mr. Coady conflicting information regarding the travel vouchers and shifting explanations concerning the processing of his vouchers.  Finally, Mr. Coady contacted five different GovTrip representatives.  All the GovTrip representatives stated that Ms. Noble-Burns had to open an account via the electronic GovTrip system.  When Mr. Coady later approached Ms. Noble-Burns, she falsely asserted that she had discussed the matter with GovTrip representatives and they had told her to submit the requests via paper.  Finally, Mr. Coady told Mr. Smith that he had not received receive reimbursement for his travel vouchers.  Mr. Smith responded that Mr. Coady had not submitted his vouchers on time, even though Mr. Coady had never previously informed him of the issue, and the only way he could have known was if Ms. Clapp informed him.  Mr. Coady asked Mr. Smith if he would have to file a lawsuit to get reimbursement.   Shortly thereafter, Mr. Coady was reimbursed for his travel vouchers.

Interrogation Based on False Claims

40. On or around April 25, 2012, Mr. Coady was working at his desk and looked up to see Ms. Leone standing in the doorway to her office, glaring at him.   She had not announced her presence, but stared at Mr. Coady with an angry look on her face, until Mr. Coady asked her if he

could help her.  In a hostile tone, Ms. Leone accused Mr. Coady of shouting and asserted that her

assistant, Jean Barto, had said Mr. Coady had been shouting.  Ms. Leone repeated her assertion

that Ms. Barto said she heard Mr. Coady shouting and demanded an explanation.  Once again, Mr.

Coady denied shouting, and she repeated her accusation several more times.  Mr. Coady laptop

was programmed to announce the time, and Ms. Leone jumped when his laptop announced the

time.  She crossed to the other side of his desk, moved very close to him, and leaned up against

Mr. Coady to look at the laptop, making Mr. Coady very uncomfortable.  Next, Ms. Leone

demanded Mr. Coady provide her with a document accounting for all his work from the previous

week and the tasks Mr. Coady intended to accomplish the following day and the following week.

Allegations of performance deficiencies and unsatisfactory mid-year review

41. In or around December 2011, Ms. Clapp removed Mr. Coady from the position of Chief

of IT Development and reassigned him to the position of Business Intelligence Advisor.  While

Mr. Coady had a great deal of experience and knowledge concerning the requirements of his

position as Chief of IT Development, Mr. Coady had no experience performing the duties of a

Business Intelligence Advisor.   Thus, Mr. Coady repeatedly requested training for his new duties

as Business Intelligence Advisor.  In an attempt to set Mr. Coady up to fail in his new position,

Ms. Clapp denied all his requests for training.  In addition, Ms. Clapp denied funding for necessary

equipment and services, including servers, and reprimanded Mr. Coady for attempting to

collaborate with other FMCSA employees concerning his tasks.  She subjected Mr. Coady to

unreasonable expectations and ignored his report to her that a project similar to his assignment had

taken fifteen people around one and a half years to complete.

42. Ms. Clapp instituted a requirement that Mr. Coady submit daily status reports to her,

even though none of his colleagues were required to submit daily status reports.  Mr. Coady repeatedly requested feedback concerning the form of his daily status reports, but she would not give Mr. Coady feedback.

43. In early January 2012, Ms. Clapp assigned Mr. Coady to develop a work plan, which required Mr. Coady to project the costs of the project and the time it would take to complete the project, determine milestones and deliverables, and conduct a scope assessment.  Mr. Coady knew that if these estimations and projections were inaccurate, Ms. Clapp would reprimand or discipline Mr. Coady for failing to do the necessary preliminary work.  Ms. Clapp also directed Mr. Coady to conduct an inventory of all IT standards in use to develop a methodology for determining necessary standards.  To accomplish this, Mr. Coady had to coordinate with Bob Berk, Anthony Rahner, and Larry Shillberg.  None of the individuals were immediately available, and Mr. Berk was not scheduled to return to the office until January 25, 2012.  Nonetheless, on January 12 and 17, 2012, Ms. Clapp reprimanded Mr. Coady for not producing a work plan and for not providing an updated work plan, before he was able to complete the required preliminary work.

44. Mr. Coady consistently provided Ms. Clapp with daily and weekly status reports, including presenting her with a status report on February 23, 2012.  On March 6, 2012, Ms. Clapp reprimanded Mr. Coady for not providing a weekly status report, but admitted that he regularly sent her status reports about his activities.

45. Mr. Coady was never placed on a performance improvement plan ("PIP") prior to his June 1, 2012 evaluation.

46. On June 1, 2012, Ms. Clapp asked Mr. Coady to speak with her concerning his upcoming performance evaluation.  During this meeting, Ms. Clapp brought up his EEO complaint and asked Mr. Coady why he did not go after Ms. Leone, rather than her.  Ms. Clapp explained

that Ms. Leone was proficient at ensuring that her attempts to target Mr. Coady could not be traced back to her.  Next, Ms. Clapp requested Mr. Coady drop his EEO complaint.  Immediately after she made this request, she reminded Mr. Coady that his performance evaluation was coming up. Mr. Coady recently interpreted this as a threat to provide him with an unsatisfactory performance evaluation if he did not drop his EEO complaint.

47.  Ms. Clapp issued Mr. Coady a mid-term review, which contained false and inaccurate information and was incorrectly labeled a mid-term review.  Contrary to the assertions in the review, Mr. Coady always submitted communications that were brief and precise, used plain language, and filtered pertinent information.  Mr. Coady had never been directed to transcribe minutes from meetings or to provide such minutes to any person.   Finally, Mr. Coady daily and weekly status reports properly communicated the status, issues, and progress towards milestones relating to his assignments.  Although Mr. Coady repeatedly requested clarification concerning Ms. Clapp's expectations for status reports, she almost never provided such clarification.  On the few instances she provided feedback regarding Mr. Coady status reports, he used her feedback in preparing his status reports.  However, Ms. Clapp continued to find fault with Mr. Coady reports. Mr. Coady provided status reports in many different formats in an attempt to discover her expectations, but Ms. Clapp reprimanded Mr. Coady for providing status reports in different formats.

Additional Allegations of Harassment

48. Ms. Clapp harassed Mr. Coady on many other occasions.  She ridiculed Mr. Coady and mocked his credentials at meetings, reprimanded Mr. Coady for sending a reminder notice about a meeting, and withheld his plaques from Mr. Coady while providing them to all other employees.

In addition, Mr. Coady was the only one who was required to produce all historic and ongoing help desk tickets.

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964, as amended
### 42 U.S.C. § 2000e *et seq.*
### Discrimination Based on Sex

49.     Plaintiff incorporates by reference paragraphs 1 through 48 as if fully stated herein.

50.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex, national origin or race.

51.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

52.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

53.     In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq.*, Defendant knowingly and intentionally subjected Plaintiff to disparate treatment based on his sex, when: 1) Agency management requested unreasonable  and illegal medical documentation and harassed him about his disability and use of leave; 2) in March 2012, Plaintiff was placed on AWOL; 3) in April 2012, management accused Plaintiff of shouting and proceeded to interrogate him rather than try to find out if something was wrong; 4) Plaintiff's supervisor asked him to withdraw his EEO complaint so she could leave the agency with a clean record; 5) in July 2012, Plaintiff was given a poor mid year evaluation; 6) Plaintiff's travel plans were not timely reimbursed; 7) Plaintiff  was denied necessary tools and training to perform his job successfully; and 8) Plaintiff was denied a reasonable accommodation.

54.     As a result of such acts, Plaintiff has suffered damages.

## COUNT II
### Violation of Title VII of the Civil Rights Act of 1964, as amended
### 42 U.S.C. § 2000e *et seq.*
### *Retaliation*

55.     Plaintiff incorporates by reference paragraphs 1 through 54 as if fully stated herein.

56.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual engaged in protected activities, including reporting discrimination.

57.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

58.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

59.     Plaintiff engaged in protected activities when he reported that she was being subjected to discrimination, retaliation, and a hostile work environment by her supervisors.

60.     In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq.*, Defendant knowingly and intentionally subjected Plaintiff to retaliation after he filed and EEO complaint with the Agency on November 28, 2011, when: 1) Agency management requested unreasonable  and illegal medical documentation and harassed him about his disability and use of leave; 2) in March 2012, Plaintiff was placed on AWOL; 3) in April 2012, management accused Plaintiff of shouting and proceeded to interrogate him rather than try to find out if something was wrong; 4) Plaintiff's supervisor asked him to withdraw his EEO complaint so she could leave the agency with a clean record; 5) in July 2012, Plaintiff was given a poor mid year evaluation; 6)

Plaintiff's travel plans were not timely reimbursed; 7) Plaintiff  was denied necessary tools and

training to perform his job successfully; and 8) Plaintiff was denied a reasonable accommodation.

61.     As a result of such acts, Plaintiff has suffered damages.

### COUNT III
### Violation of Title VII of the Civil Rights Act of 1964, as amended
### 42 U.S.C. § 2000e *et seq.*
### Discriminatory and Retaliatory Hostile Work Environment

62.     Plaintiff incorporates by reference paragraphs 1 through 61 as if fully stated herein.

63.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment

practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's sex, national origin or race or because such

individual engaged in protected activities, including reporting discrimination.

64.     A hostile work environment is a form of prohibited employment discrimination

where the employee is subjected to a work environment permeated with ridicule and humiliation

that substantially alters the work environment.

65.     At all pertinent times, the Defendant was an employer subject to provisions of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

66.     At all pertinent times, Plaintiff was an employee entitled to protection under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

67. In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*.,

Defendant knowingly and intentionally subjected Plaintiff to a hostile work environment based on

his sex and disability, when: 1) Agency management requested unreasonable  and illegal medical

documentation and harassed him about his disability and use of leave; 2) in March 2012, Plaintiff

was placed on AWOL; 3) in April 2012, management accused Plaintiff of shouting and proceeded

to interrogate him rather than try to find out if something was wrong; 4) Plaintiff's supervisor asked him to withdraw his EEO complaint so she could leave the agency with a clean record; 5) in July 2012, Plaintiff was given a poor mid year evaluation; 6) Plaintiff's travel plans were not timely reimbursed; 7) Plaintiff was denied necessary tools and training to perform his job successfully; and 8) Plaintiff was denied a reasonable accommodation.

68. As a result of such acts, Plaintiff has suffered damages.

**COUNT IV**
**Violation of the Rehabilitation Act, 29 U.S.C. § 791**
**Failure to Accommodate**

69. Plaintiff incorporates by reference paragraphs 1 through 68 as if fully stated herein.

70. The Rehabilitation Act of 1973 prohibits discrimination in employment based on disability. An employer discriminates against an employee based on disability when the employer fails to provide a qualified employee with a disability a reasonable accommodation for the disability.

71. At all times relevant to this Complaint, the Department of Transportation was an employer within the meaning of Rehabilitation Act of 1973.

72. At all times relevant to this Complaint, Plaintiff Coady was an employee within the meaning of the Rehabilitation Act of 1973.

73. Plaintiff Coady is a qualified individual with a disability based a diagnosis of spondyloisthesis, segmental instability, spinal stenosis, radiculitis, sacrolititis, and lumbar disc herniation related to his back, and was at all times capable of performing the essential functions of his position. He requested a reasonable accommodation for his disability in 2011 and 2012 in the form of flexible work hours, and the ability to telework. Accordingly, the Agency was required to provide Mr. Coady a reasonable accommodation.

74. The Agency harassed him about his use of leave, failed to provide Mr. Coady his requested accommodation and failed to engage in an interactive process with Mr. Coady to determine an alternative reasonable accommodation, in violation of the Rehabilitation Act of 1973.

75. The Defendant would have suffered no undue hardship had it provided Mr. Coady with a reasonable accommodation.

76. As a result of the Defendant's failure to accommodate, Mr. Coady endured unnecessary pain and suffering for approximately eighteen months.

<u>COUNT V</u>
**Violation of the Rehabilitation Act, 29 U.S.C. § 791**
**Disability Discrimination**

77.  Plaintiff incorporates by reference paragraphs 1 through 76 as if fully stated herein.

78. The Rehabilitation Act of 1973 prohibits discrimination in employment based on disability.  An employer discriminates against an employee based on disability when the employer takes adverse action against that employee because the employee is disabled, or treats similarly situated employees who are not disabled more favorably than the disabled employee.

79. At all times relevant to this Complaint, the Department of Transportation was an employer within the meaning of Rehabilitation Act of 1973.

80. At all times relevant to this Complaint, Plaintiff Coady was an employee within the meaning of the Rehabilitation Act of 1973.

81.  Mr. Coady is "disabled" based on a qualified individual with a disability based a diagnosis of spondyloisthesis, segmental instability, spinal stenosis, radiculopathy, sacrolititis, and lumbar disc herniation related to his back, and was at all times capable of performing the essential functions of his position.   .

82. Defendant discriminated against Plaintiff Coady when: 1) Agency management

requested unreasonable  and illegal medical documentation and harassed him about his disability

and use of leave; 2) in March 2012, Plaintiff was placed on AWOL; 3) in April 2012, management

accused Plaintiff of shouting and proceeded to interrogate him rather than try to find out if

something was wrong; 4) Plaintiff's supervisor asked him to withdraw his EEO complaint so she

could leave the agency with a clean record; 5) In July 2012, Plaintiff was given a poor mid year

evaluation; 6) Plaintiff's travel plans were not timely reimbursed; 7) Plaintiff  was denied

necessary tools and training to perform his job successfully; and 8) Plaintiff was denied a

reasonable accommodation.

83. Defendant had no legitimate business reasons for such acts.

84. As a result of such discriminatory acts, Plaintiff Coady has suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE and for the foregoing reasons, Plaintiff respectfully prays as follows:

a.   Issue a declaratory judgment that Defendant's practices toward Plaintiff were violative of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and the Rehabilitation Act, 29 U.S.C. § 791;

b.   Enjoin Defendant from discriminating against employees based on their sex, and employees who report discriminatory practices under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and the Rehabilitation Act, 29 U.S.C. § 791;

c.   Award Plaintiff damages, including back pay and front pay and all lost benefits and performance bonuses and compensatory damages for

emotional distress and hardship created by the Defendant's discrimination and retaliation;

d.      Award payment of all fees, costs, expenses, including attorneys' fees and expert fees; and

g.      Award Plaintiff such other relief as to which she may be deemed entitled.

## **JURY TRIAL**

Plaintiff requests a trial by jury on all issues that are triable by jury.

Respectfully submitted,

_____/s/_____

David A. Branch #438764
Law Office of David A. Branch &
Associates, PLLC
1828 L Street NW, Suite 820
Washington, DC 20036
(202) 785-2805 phone
(202) 785-0289 fax
davidbranch@dbranchlaw.com