UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIAN COADY,

    *Plaintiff*,

    v.

ELAINE CHAO, Secretary of Transportation,

    *Defendant*.

No. 16-cv-2010 (DLF)

**MEMORANDUM OPINION**

Plaintiff Brian Coady brings this action against his former employer, the Secretary of the U.S. Department of Transportation (DOT), under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. Coady alleges that DOT discriminated against him based on his sex and disability, retaliated against him, and subjected him to a hostile work environment. Compl. ¶¶ 49–84, Dkt. 1. Before the Court is DOT's Motion for Summary Judgment, Dkt. 24. For the reasons that follow, the Court will grant the motion.

**I.    BACKGROUND**

Brian Coady began working at the Federal Motor Carrier Safety Administration, a subdivision of DOT, in 2009. Coady Decl. ¶ 1, Dkt. 26-2. His first year of employment passed without any apparent misconduct or problems. *See id.* ¶ 2. But Coady's relationships with his supervisors began to deteriorate in summer 2010 when he was diagnosed with spondylolisthesis, lumbar disc herniation, and other serious back conditions. *Id.* ¶ 4.

In June 2010, Coady's physician warned him that he could become substantially disabled if he failed to undergo a fusion surgery on his back. *Id.* To be eligible for the procedure, the

doctor required Coady to attend three physical therapy appointments per week for six consecutive weeks. *Id.*; *see also* DOT's Statement of Material Facts ¶ 6, Dkt. 24-1. Coady agreed with that treatment plan and scheduled the surgery for September 2010. *Id.*

The demands of Coady's work prevented him from complying with the treatment plan. Coady alleges that he was forced to cancel a number of physical therapy appointments to avoid missing difficult-to-predict meetings because his supervisor, Kelly Leone, "harassed" and "reprimanded" him for missing meetings. Coady Decl. ¶ 6. He also alleges that when he described his diagnosis, the restrictions on his movement, and his need to take time off of work, Leone responded in an "annoyed," "dismissive," and "aggressive[]" manner. *Id.* ¶ 9; *see, e.g., id.* ¶ 8 (recounting an incident in which Leonne described a hospital visit as a "stunt"). Coady further asserts that his promotion in August 2010 to Information Technology Development Chief led to increased work responsibilities that made it even more difficult to attend physical therapy appointments three times each week. Coady's Resps. to DOT's First Set of Disc. Reqs. at 21, Dkt. 26-3. Eventually, Coady had to cancel the September surgery. Coady Decl. ¶ 6.

In the ensuing months, Coady's condition worsened, and he rescheduled the surgery for January 2012. *Id.* ¶ 10; *see also* Coady's Resps. to DOT's First Set of Disc. Reqs. at 23. Coady made a series of medical appointments to prepare for the procedure, but when he requested sick leave, his new supervisor, Mary Clapp, repeatedly objected to the documentation provided in his doctor's notes. Coady Decl. ¶¶ 10–20. For example, in late November 2011, she demanded that he provide both pre- and post-appointment doctor's notes specifying the date and time of any appointment, his diagnosis, and the treatment plan. *Id.* ¶ 12. His doctors, however, would not sign pre-appointment letters. *Id.*

In November 2011, Coady requested permission to telework until his surgery. *Id.* ¶ 15. In support of his request, Coady provided Clapp with a brief note from the Virginia Spine Institute stating that he "should telework until his spine surgery on 1/9/12" because of an "ongoing medical condition." First Virginia Spine Institute Letter, Dkt. 24-5. But Clapp objected that Coady's doctor could not specify how DOT should accommodate his condition, and she requested another letter detailing his diagnosis and limitations. Coady Decl. ¶ 15. Coady then submitted two additional letters. First, he submitted a Department of Veteran's Affairs letter stating that he could return to work as early as December 5, 2011 with the following "reasonable accommodations: no lifting > 20 lbs., [and] no extended periods of walking or standing." Veterans Affairs Letter, Dkt. 24-6; *see also* Coady Decl. ¶ 16. Second, he submitted another, more detailed letter from the Virginia Spine Institute that stated, "[Coady] feels that he is unable to continue commuting to work and that this is causing him too much pain and discomfort to function. Based upon his diagnostic studies and his physical examination, I feel that it is reasonable for him to telework as opposed to driving to the office." Second Virginia Spine Institute Letter at 1, Dkt. 24-6. According to the Virginia Spine Institute, although "sitting for one-hour duration aggravates [Coady's] pain severely," he can "produce an eight-hour work day over an extended period of time" with the ability to change positions, stretch, and relax. *Id.*

Unpersuaded, Clapp requested a specific explanation for why Coady could not change positions at the office rather than at home, how long Coady needed to relax in between breaks, and what the length of the extended work day would be. Coady Decl. ¶ 16; Email Re: Request for Medical Documentation, Dkt. 24-8. At this point, the Virginia Spine Institute refused to provide any further documentation to Clapp, although it did release a copy of Coady's medical

records to him. Coady Decl. ¶¶ 17, 20. Coady also obtained and submitted a January 3, 2012, letter from George Washington University Medical Faculty Associates indicating, among other things, that he could not perform "work requiring walking, standing[,] or sitting without a break every 60 minutes." George Washington Med. Faculty Assocs. Letter, Dkt. 24-10. But Clapp remained unconvinced that Coady's medical condition required him to telework because the letter "did not clarify [Coady's] need for full-time telework." Email Re: Accommodation Request at 1, Dkt. 24-11. Clapp then formally denied his telework request, stating, "I am unable to make a disability determination based upon the information that you have provided at this time. I am therefore closing your request for [an] accommodation. If you would like to be reconsidered or to reopen your request, please let me know." *Id.* at 2. Clapp did, however, offer Coady other accommodations, including a standing desk, an ergonomic chair, and a cot for his office. DOT's Statement of Material Facts ¶ 17; *see also* Email Re: Special Seating Fitting, Dkt. 24-12.

At around the same time that Coady was seeking increasingly detailed doctor's notes, he sought Equal Employment Opportunity (EEO) counseling. Counselor's Report at 2 n.2, 36, Dkt. 24-2; Coady's Opp'n at 21, Dkt. 26. On November 28, 2011, he informally alleged sex and disability discrimination, and on February 22, 2012, DOT notified Coady of his right to file a formal discrimination complaint. Counselor's Report at 2 n.2, 36; Coady's Opp'n at 21. When Coady failed to do so, DOT closed his informal complaint. Counselor's Report at 2 n.2, 36; Coady's Opp'n at 21.

Nevertheless, Coady continued to clash with his colleagues. In December 2011, Clapp reassigned Coady to work as a Business Intelligence Advisor. Coady Decl. ¶ 36. But according

to Coady, she repeatedly denied his requests for training "[i]n an attempt to set [him] up to fail in [his] new position." *Id.*

Coady also sought reimbursement in December 2011 for three business trips in August and September 2011. Coady Decl. ¶¶ 32, 34. Although one DOT employee originally told Coady that he could submit the requests in the following year, another employee told him that his requests were not timely. *Id.* In the end though, he received the requested reimbursements. *Id.* ¶ 34.

Meanwhile, Coady's medical conditions continued to create scheduling and other problems. In January 2012, Coady's back surgery was again canceled because he failed to complete the required physical therapy treatment. *Id.* ¶ 21. Coady alleges that at a January 9, 2012 pre-operation appointment, he requested a "return-to-work" form that would excuse his absence from work. Coady's Resps. to DOT's First Set of Disc. Reqs. at 19. Because it allegedly did not have a "return-to-work" form, the hospital provided him with only a print out of his appointment schedule. *Id.* Clapp refused to accept this documentation and threatened to cancel Coady's preapproved leave for his surgery unless he provided her with his medical records. *Id.* Coady does not allege that Clapp made good on this threat.

Tensions further escalated in late February 2012, when Coady allegedly suffered from either the flu or food poisoning. Coady Decl. ¶ 24. The illness caused Coady to sleep for nearly the entirety of two days and to go to the emergency room on the third day. *Id.* ¶¶ 24–25, 27, 29. Clapp initially refused to accept Coady's documentation, which included emergency room discharge papers, and she charged him with being away without leave (AWOL). DOT's Statement of Material Facts ¶ 29–31; Coady's Statement of Disputed Material Facts at 6–7, Dkt. 26-1. After Coady provided additional documentation, however, the charge was rescinded

5

for all but half of one day. DOT's Statement of Material Facts ¶ 29–30; Coady's Statement of Disputed Material Facts at 6–8.

About a month later, Coady alleges that Leone, his former supervisor, behaved in a manner that was intimidating to him. In particular, Coady alleges that she appeared in his doorway and, in a "hostile" tone, accused him of shouting at a coworker. Coady Decl. ¶ 35. After Coady denied shouting at his coworker, his laptop announced the time and, in order to look at his laptop, Leone "moved very close to [him]" and made him feel "uncomfortable." *Id.*

The parties' final dispute began on June 1, 2012, when Coady and Clapp met to discuss an upcoming mid-year performance evaluation. *Id.* ¶ 41. There, Clapp allegedly asked Coady to withdraw his informal EEO complaint against her. *Id.* Coady perceived Clapp's comments as a "threat" that if he failed to withdraw the complaint, she would give him an unsatisfactory performance evaluation. *Id.* And in late July, Coady received negative feedback about his ability to develop work plans, prepare status reports, and communicate clearly. *Id.* ¶ 42; *see also* DOT's Statement of Material Facts ¶¶ 38, 40; Coady's Statement of Disputed Material Facts at 9.

On June 28, 2012, Coady again sought EEO counseling, and this time, he filed a formal complaint. *See* Counselor's Report at 2. Finally, on January 29, 2013, approximately two and a half years after he began feeling back pain, Coady received surgery for his back conditions. Coady Decl. ¶ 22.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A

"material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

It is well established, however, that "a plaintiff opposing summary judgment" must "substantiate [his allegations] with evidence" that "a reasonable jury could credit in support of each essential element of h[is] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. ANALYSIS

Coady claims that DOT repeatedly discriminated against him on the basis of his sex and disability, that it retaliated against him for engaging in protected activities, that it failed to reasonably accommodate his disability, and that it subjected him to a discriminatory and retaliatory hostile work environment based on his sex, disability, and protected activity. Compl. ¶¶ 49–84. The Court concludes that Coady failed to exhaust his administrative remedies for most of his discrete discrimination claims. It also holds that DOT is entitled to summary judgment on Coady's remaining claims, namely, those based on his mid-year performance evaluation and alleged hostile work environment.

## A. The Unexhausted Discrete Discrimination Claims

Before a federal employee may sue a federal agency under Title VII or the Rehabilitation Act, "the employee must run a gauntlet of agency procedures and deadlines to administratively exhaust his or her claims." *Crawford v. Duke*, 867 F.3d 103, 105 (D.C. Cir. 2017); *see also* 29 U.S.C. § 794a(a)(1). The employee must first initiate contact with an EEO counselor within 45 days of the allegedly discriminatory act. 29 C.F.R. § 1614.105(a)(1). If the matter is not resolved through informal counseling within 30 days (or 60 days by agreement), the Counselor must notify the employee of his right to file a formal complaint, and the employee must do so within 15 days. *Id.* §§ 1614.105(d)–(e), 1614.106(b). The agency then has 180 days to investigate the complaint and issue a final decision. 29 C.F.R. § 1614.106(e)(2). Only then may an employee bring a civil action, and he must do so within 90 days of receipt of the agency's final decision or 180 days after the filing of the complaint if the agency fails to issue a timely decision. 42 U.S.C. § 2000e-16(c). If the employee fails to comply with this timeline, the "discrete discriminatory act[]" alleged is time barred—"even [if it is] related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also id.* ("Each discrete discriminatory act starts a new clock for filing charges alleging that act.").

The parties do not dispute that the claims based on Coady's mid-year evaluation and the hostile work environment claims are timely. The meeting with Clapp to discuss his mid-year evaluation occurred within 45 days of June 28, 2012, when Coady initiated contact with an EEO counselor for the second time.[1] *See* Coady's Decl. ¶ 41. And Coady's hostile work environment

---

[1] Although Coady's mid-year evaluation occurred after he sought EEO counseling in June 2012, DOT does not argue that any claim based on that evaluation falls outside the filing period. Accordingly, any such argument is waived. *See Morgan*, 536 U.S. at 121 ("[T]he filing period is not a jurisdictional prerequisite" and is "subject to waiver.").

8

claims are also timely because "at least one act" that was allegedly part of the "unlawful employment practice"—the meeting about the mid-year evaluation—fell within 45 days of the June 28, 2012 meeting with the EEO counselor. *Morgan*, 536 U.S. at 122 ("A charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.").

The parties dispute only whether Coady administratively exhausted his remaining discrete discriminatory claims. He did not. Coady argues that the Court may consider his earlier claims—those based on his supervisors' requests for medical documentation and travel reimbursements, his training requests, the AWOL charges, and Leone's shouting accusation— because he initiated EEO contact on November 28, 2011. Coady's Opp'n at 21–22. But Coady abandoned any claims that would have been timely based on that counseling when he failed to file a formal complaint. *See Wilson v. Clayton*, 272 F. Supp. 3d 25, 30 (D.D.C. 2017) ("Although Wilson complained to an EEO counselor in November 2013 about her treatment . . . , she did not subsequently file a formal agency complaint and thus abandoned those claims.").

The Court also rejects Coady's argument that his reasonable accommodation claim is timely because he "continued to attempt to get additional documentation" after Clapp denied his request on March 12, 2012, and because "[i]t took some time" for Coady to conclude that "it would be essentially impossible to obtain medical documentation of his condition in sufficient detail to comply with . . . Clapp's requests." Coady's Opp'n at 22 n.2. Clapp's "negative response[]" to Coady's request was a "discrete act[]" that occurred on March 12, 2012, well outside of the 45-day period preceding Coady's June 28, 2012 EEO counseling. *Long v. Howard*

9

*Univ.*, 512 F. Supp. 2d 1, 17 (D.D.C. 2007); *see also id.* at 16 (collecting cases holding that a denial of a reasonable accommodation is a "discrete act" under *Morgan*); Email Re: Accommodation Request at 2 (Clapp stating on March 12, 2012, "I am therefore closing your request for accommodation"). And even if the Court could consider Coady's independent actions—which never culminated in further discussions with his supervisors—Coady offers no evidence that establishes that his subsequent actions occurred within the 45-day period preceding his June 28, 2012 EEO counseling. The Court will therefore dismiss all claims other than those based on the mid-year evaluation and the discriminatory and retaliatory hostile work environment claims.

> **B.     The Sex Discrimination, Disability Discrimination, and Retaliation Claims Based on the Mid-Year Performance Evaluation**

All three claims based on Coady's mid-year performance evaluation require either an adverse employment action or a materially adverse action. "Under Title VII . . . and the Rehabilitation Act, the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). The D.C. Circuit has elaborated that "[a]n employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Baird v. Gotbaum*, 662 F.3d 1246, 1248–49 (D.C. Cir. 2011) (alteration adopted and internal quotation marks omitted). And "[t]o prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198. "In the retaliation context[,] the 'adverse action' concept has a broader meaning," *Baird*, 662 F.3d at 1249, and encompasses harms that

10

"would dissuade a reasonable worker from making or supporting a charge of discrimination," *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (alteration adopted and internal quotation marks omitted). Nonetheless, the D.C. Circuit has held that a performance evaluation can be "materially adverse" in the retaliation context only if it "affect[s] the employee's position, grade level, salary, or promotion opportunities" or is "attached to financial harms." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (internal quotation marks omitted); *see also Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010) ("[T]he interim assessment did not affect Porter's position, grade level, salary, or promotion opportunities and was therefore not a materially adverse action." (internal quotation marks omitted)); *Baloch*, 550 F.3d at 1199 ("[P]erformance reviews typically constitute adverse actions only when attached to financial harms.").

Coady's mid-year performance evaluation was neither an "adverse employment action" sufficient to maintain his sex and disability claims nor a "materially adverse action" sufficient to maintain his retaliation claim. The closest Coady comes to alleging that the evaluation had any consequences at all is his unsupported assertion that Clapp intended to "poison his next supervisor's perception of him." Coady's Opp'n at 47. But Coady fails to offer any evidence that the second supervisor was so affected, and his speculation about the intent of his current supervisor does not establish that the mid-year evaluation "affect[ed] [his] position, grade level, salary, or promotion opportunities" or led to "financial harms." *Taylor*, 571 F.3d at 1321; *see also Baloch*, 550 F.3d at 1199 ("Baloch did not produce evidence showing that the 2003 negative performance evaluation could affect his position, grade level, salary, or promotion opportunities."); *Turner v. U.S. Capitol Police Bd.*, 983 F. Supp. 2d 98, 107 (D.D.C. 2013) (plaintiff failed to allege necessary facts), *aff'd*, 653 F. App'x 1 (D.C. Cir. 2016). To the contrary, the record reveals that the evaluation was devoid of "abusive language" and contained

11

only "job-related constructive criticism." *Baloch*, 550 F.3d at 1199; *see* Performance Appraisal Plan at 7–9, Dkt. 24-16. On this record, DOT is entitled to summary judgment on the sex discrimination, disability discrimination, and retaliation claims based on the mid-year evaluation.[2]

### C. The Discriminatory and Retaliatory Hostile Work Environment Claim

To establish a discriminatory or retaliatory hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79, 82–83 (D.D.C. 2013) (collecting cases establishing that "the same legal standard" applies to discriminatory and retaliatory hostile work environment claims). In assessing whether a hostile work environment exists, courts "look[] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* Title VII is not a "general civility code"; the alleged conduct "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted); *see also Baloch*, 550 F.3d at 1201. In addition, the alleged conditions must be both "objectively and subjectively hostile, meaning that a reasonable person would find [the

---

[2] Moreover, even if Coady had alleged an adverse employment action, he has failed to identify any evidence that even arguably suggests that the alleged discriminatory acts were committed because of his sex. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 497 (D.C. Cir. 2008) (a plaintiff survives summary judgment only if he "put[s] forward sufficient evidence for a reasonable jury to find that the employer's legitimate, non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against him on the basis of" a protected characteristic).

12

work environment] hostile or abusive, and that the victim must subjectively perceive the environment to be abusive." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (alteration adopted and internal quotation marks omitted).

Coady alleges that he was subjected to a hostile work environment due to his sex, disability, and protected activity based on eight acts: (1) "[a]gency management requested unreasonable and illegal medical documentation and harassed [Coady] about his disability and use of leave"; (2) Coady was "placed on AWOL"; (3) "management accused [Coady] of shouting and proceeded to interrogate him rather than try to find out if something was wrong"; (4) Clapp "asked [Coady] to withdraw his EEO complaint"; (5) Coady "was given a poor mid[-]year evaluation"; (6) Coady's "travel plans were not timely reimbursed"; (7) Coady "was denied necessary tools and training to perform his job successfully"; and (8) Coady "was denied a reasonable accommodation." Compl. ¶ 67.

These allegations are not sufficiently severe or pervasive to have "alter[ed] the conditions of [Coady's] employment and create[d] an abusive working environment." *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted). To start, the allegations are spread out over approximately two years and involve complaints pertaining to two different supervisors. *See Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing a hostile work environment claim, in part because "the alleged events [we]re temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness").

More importantly, these allegations "are not the kind of 'extreme' conditions that this Court and the Supreme Court have found to constitute a hostile work environment." *Hill*, 897 F.3d at 237. Coady's complaints about the AWOL charge, Leone's shouting accusation, Coady's delayed reimbursement for travel expenses, and his training and funding requests do not

13

amount to more than "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788 (internal quotation marks omitted); *see id.* (allegation of "sporadic use of abusive language" is insufficient); *Baloch*, 550 F.3d at 1201 (allegations related to "several verbal clashes with [the plaintiff's] supervisor" are insufficient); *Akosile v. Armed Forces Ret. Home*, 938 F. Supp. 2d 76, 86–87 (D.D.C. 2013) (allegations related to "[t]hree isolated incidents over the course of three months," including an "alleged charge that the plaintiff was AWOL at points," were insufficient); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 81 (D.D.C. 2007) (allegations that the plaintiff was denied "requests for additional resources despite an increased workload" were insufficient); *Nurriddin*, 382 F. Supp. 2d at 106 (allegation that "defendant destroyed records of travel vouchers" was insufficient), *aff'd*, 222 F. App'x 5 (D.C. Cir. 2007).

Nor is the Court persuaded that Coady's allegations of uneven treatment meet the high threshold of "extreme" conduct necessary to establish a hostile work environment. *Faragher*, 524 U.S. at 788. Clapp's demands that Coady provide increasingly detailed medical documentation to justify his leave requests and avoid taking leave during meetings were "far from severe and [were] never physically threatening." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) ("[T]he selective enforcement of workplace rules and the failure to extend certain informal courtesies are part of conduct that is far from severe and never physically threatening." (alteration adopted and internal quotation marks omitted) (citing *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 74 (1st Cir. 2011))). Indeed, the D.C. Circuit has held that the selective imposition of sick leave restrictions, among other things, is insufficient to create a hostile work environment. *Baloch*, 550 F.3d at 1195, 1201; *see also Aldrich v. Burwell*, 197 F. Supp. 3d 124, 137–38 (D.D.C. 2016). And although Clapp denied Coady's teleworking request, she did offer him other accommodations, including a standing desk, an ergonomic chair, and a cot for his

14

office. DOT's Statement of Material Facts ¶ 17; Coady's Statement of Disputed Material Facts at 3–6; *see also Hill*, 897 F.3d at 237 ("While a jury could find that assigning [an amputee] to the third floor and denying him a classroom aide failed to reasonably accommodate his disability, these are not the kind of 'extreme' conditions that this Court and the Supreme Court have found to constitute a hostile work environment.").

Finally, Clapp's one-time suggestion that Coady withdraw his complaint and his mid-year evaluation does not establish that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citation and quotation marks omitted). Explicit threats to harm an employee have not been sufficient in other cases to establish a hostile work environment claim. *See, e.g.*, *Stevenson v. Delta Airlines, Inc.*, 251 F. Supp. 3d 265, 268 (D.D.C. 2017) (allegation that plaintiff was "forced to endure an atmosphere filled with constant threats of termination and demeaning conduct" was insufficient); *Rattigan*, 503 F. Supp. 2d. at 79–81 (threat of castration was insufficient). And although Coady's mid-year evaluation contained criticism, it also "recommended areas of improvement—hardly the stuff of severe or pervasive workplace hostility." *Brooks*, 748 F.3d at 1277; *see also Baloch*, 550 F.3d at 1201 (plaintiff's "allegations of insult [were] undercut by the legitimate reasons and constructive criticism offered in the letters of counseling and reprimand").

Even taking all of the above allegations together, as the Court must, Coady has not met his burden of establishing a hostile work environment. Indeed, courts have rejected far more serious allegations because they fail "to alter the conditions of . . . employment and create an

abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks omitted).[3]

DOT is therefore entitled to summary judgment on Coady's hostile work environment claims.

## CONCLUSION

For these reasons, the Court grants DOT's motion for summary judgment. A separate order accompanies this memorandum opinion.

*Dabney L. Friedrich*
DABNEY L. FRIEDRICH
United States District Judge

September 26, 2019

---

[3] *See, e.g.*, *Baloch*, 550 F.3d at 1195, 1201 (summary judgment appropriate where hostile work environment claim was based on allegations of poor performance reviews, several letters of counseling and reprimand, leave restrictions, two proposed suspensions, and several verbal altercations, including one in which a supervisor threatened to have the plaintiff "arrested, led out of the building in handcuffs, and jailed"); *George v. Leavitt*, 407 F.3d 405, 408–09, 416–17 (D.C. Cir. 2005) (same where claim was based on, among other things, "several confrontations" in which different employees told the female black plaintiff to "go back to where she came from," the plaintiff was "assigned to various clerical duties that the white male engineers were never required to do," and the plaintiff's supervisor recommended that she be fired (alteration adopted)); *Walden v. Patient-Centered Outcomes Research Inst.*, 177 F. Supp. 3d 336, 340, 344–45 (D.D.C. 2016) (plaintiff failed to state a claim for relief where her claim was based on allegations that the plaintiff's supervisor "encouraged [her] to skip physical therapy, had her stay late on days when [the supervisor] knew [she] had physical therapy, and on multiple occasions, ignored or refused to approve [her] requests for paid time off," allegations that her employer failed to address her concerns about her workload and "negative treatment," and an allegation that she received a negative performance review); *Nurriddin*, 674 F. Supp. 2d at 93–94 (same where claim was based on allegations that management "passed [the plaintiff] over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks about his EEO complaints, closely scrutinized his work, refused him a window cubicle, removed some of his duties, . . . denied his requests to travel or otherwise failed to provide support for his work with staffing and funding[,] . . . opposed his career advancement[,] . . . denied many of his leave requests[,] and engaged in a series of discussions to end his eligibility for workers' compensation and to terminate his employment at NASA, before finally firing him" (internal quotation marks omitted)).